# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00736-CR

---

**Jairick Padarius Lewis, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 433RD DISTRICT COURT OF COMAL COUNTY
NO. CR2023-357D, THE HONORABLE STEPHANIE BASCON, JUDGE PRESIDING**

---

## O P I N I O N

Appellant Jairick Padarius Lewis challenges his conviction for aggravated assault with a deadly weapon for which he was sentenced to thirty-five years' confinement. *See* Tex. Penal Code §§ 22.01(a)(1), .02(a)(2). In two issues, he contends that the evidence was insufficient to prove that he used or exhibited a deadly weapon during the offense and that his sentence was improperly enhanced by a Louisiana conviction for introducing contraband into the grounds of a penal institution. We affirm the trial court's judgment of conviction.

## BACKGROUND

Around 4:30 a.m. on September 16, 2021, New Braunfels Police Department (NBPD) Officers Carlos Cruz and Zachary Kory and New Braunfels Fire Department firefighter-paramedic Patrick Swearengin responded to a disturbance call at the First Footing Shelter, which occupies the top floor of the Edelweiss Hotel in New Braunfels, Texas. The

911 caller, shelter supervisor Curtis Creekbaum, reported an altercation between the residents of Room 204, Lewis and Rojelio Ramirez. Lewis had left the shelter before officers arrived, and Swearengin took Ramirez—who was injured—to a trauma hospital in Kyle, Texas. While cleaning the room after the altercation, another shelter employee, Mark Sauceda, found a metal bar that he suspected had been used to cause Ramirez's injuries. Sauceda called the police, and NBPD Officer Thomas Powell collected the bar.

The indictment alleged that Lewis assaulted Ramirez with a deadly weapon, to-wit: a metal bar. Approximately three months before trial, Ramirez died from health issues unrelated to the assault. The State's trial witnesses included Officers Cruz, Kory, and Powell; Swearengin; Creekbaum; and Sauceda. Its evidence included a recording of Creekbaum's 911 call, photographs of Room 204 and Ramirez's injuries, Officer Cruz's body-cam video, and Ramirez's EMS and hospital records. Lewis did not call any witnesses during his case-in-chief.

Creekbaum testified that on September 16, residents of Room 205 notified him of a "fight" next door. He also testified that he heard "a lot of shouting" as he approached Room 204; when he knocked, Lewis opened the door and, in response to Creekbaum's questions, stated that he and Ramirez had been fighting and that Lewis had hit Ramirez. According to Creekbaum, Lewis's demeanor was "hyped up" and "aggressive, kind of." Creekbaum testified that Ramirez was "sitting in a chair bleeding . . . [f]rom the top of his head. There was blood all over his shirt, down his pants—or shorts." Creekbaum further testified that he was concerned about Ramirez's injuries, believed he needed medical attention, and decided to call both police and EMS. Creekbaum testified that when Lewis learned of Creekbaum's intention to call 911, Lewis said, "I'm getting out of here. I'm not going to jail for this . . . shit"; grabbed his backpack; and left.

2

Officers Cruz and Kory testified about what they observed after responding to Room 204. Officer Cruz testified that Ramirez, whose demeanor was "slow" and "lethargic," was injured and bleeding from "various parts of his body," including from "a pretty substantial cut to the front of his head." Officer Kory similarly testified that Ramirez was "covered in blood" and appeared to be in pain; his injuries included "a small cut on his left leg," "another cut on his right arm," "a large lump on the left side of his head," "a laceration on his forehead," and a "cut on the back of his head." The laceration on Ramirez's forehead was "at least a couple of inches long." Officer Cruz believed that Ramirez needed to be treated by EMS.

Officer Kory described Room 204, and photographs of the room were admitted into evidence. Against the left wall were two beds separated by a nightstand; Ramirez's bed was the one closest to the door. A desk was situated against the right wall near the entrance and next to a dresser underneath a wall-mounted television. Officer Kory testified that when the officers entered the room, there were items strewn about the floor and blood, which he believed came from Ramirez, "everywhere," including on top of the desk, on the floor, and "all over" Ramirez's bed. He also testified that there was "some blood at the end of the bed, kind of where . . . the back of [Ramirez's] head would be," as if "he were laying down on that bed." There was no blood on Lewis's bed or in the bathroom at the far end of the room.

Both Officers Cruz and Kory testified that their abbreviated search for a weapon was unsuccessful. Officer Cruz testified that they looked for a possible weapon "around the hotel room, in all the areas where a possible weapon could be. Just—really just a spot check, though, not an extensive check." Officer Kory testified that the search was "brief" and that he did not search among the clothes beside Ramirez's bed or underneath the beds.

3

Swearengin, the firefighter-paramedic, testified about Ramirez's injuries and treatment. The "large gash" and knot on Ramirez's head were concerning because "in head injuries we always worry about what could be happening underneath that we can't see." Swearengin had trouble seeing the cut on the back of Ramirez's head because "there was so much blood and it started to coagulate and dry in his hair." Ramirez had "active, slow venous bleeding," which is "more of a slow oozing" and less urgent to address than arterial bleeding, which "happens more rapidly, bright spurting red blood, and that can really be detrimental." Although Ramirez was alert and oriented and was at first able to remember the assault, he later "started not remembering exactly what was going on" and "couldn't remember the event."

Ramirez told Swearengin that he had been struck on the head by a "blunt rubber object" but had not lost consciousness. However, Swearengin noted that Ramirez's injuries were consistent with having been caused by "any sort of straight-edge type of object" and that there was nothing to indicate they had been caused by a blunt rubber object. Swearengin testified that Ramirez's forehead laceration could have been caused by the edge of the desk, but Swearengin had not seen "a massive amount of blood" on it.

The shelter employee, Sauceda, testified about finding a metal bar that he believed to be the weapon used in the assault. Although he initially agreed that he had gone to Room 204 "several days" after the assault to collect Ramirez's belongings and to clean, he then testified that he cleaned the room the "very next day" and that he remembered the date with "a hundred percent certainty." While cleaning, he noticed a footlong bent metal bar, which he recognized as a piece of the bedframe, on the floor next to Ramirez's bed and the nightstand. Wearing gloves, he took the bar to his supervisor and called the police, who "came right out" to collect it. Photographs of the bar depicted a long metal rectangle with perpendicular tabs in the

4

middle and at each end. Sauceda thought the bar had been used during the assault "because it had hair and blood on it"; he agreed that he was able to see "some of the blood marks" at trial while looking at the bar, which was admitted into evidence. When asked on cross-examination why police did not recover the object until September 24, Sauceda testified, "I guess we must have had" the bar for a week. He also testified that no one resided in Room 204 between the assault and when he found the metal bar and that neither Ramirez nor Lewis returned to the room during that interval.

Officer Powell testified that he was dispatched to the Edelweiss Hotel on September 24, 2021, and collected from Sauceda "a metal rod of some kind that was alleged to have been involved in the previous incident." Like Sauceda, Officer Powell testified that the bar "appeared to have dried blood on it." Officer Powell testified that he did not remember whether he saw the bar inside Room 204 and that he did not know if it was shown to Ramirez before his death. Moreover, Officer Powell testified that he could not say why the apparent blood on the bar was not DNA tested or why it took eight days for the bar to be brought to his attention.

The jury found Lewis guilty of aggravated assault with a deadly weapon. Prior to the punishment hearing, defense counsel agreed to the State's motion to fingerprint Lewis, who pleaded not true to both enhancement paragraphs. The State's only witness at the hearing was the fingerprint expert who took Lewis's fingerprints, Ronnie Womack. Admitted into evidence during the hearing were certified documents concerning Lewis's prior convictions from Louisiana, the minutes from two Louisiana cases not relevant to this appeal, and the ten-print card of Lewis's fingerprints made by Womack.

Womack testified that it was not possible for two people to have the same fingerprints. After he was shown a set of fingerprints among the certified conviction documents,

5

Womack testified that the prints were associated with Lewis's name and that they matched his fingerprints as documented in the ten-print card.

At the hearing's conclusion, the jury found the allegations in both enhancement paragraphs to be true and assessed Lewis's punishment at thirty-five years' confinement. The trial court sentenced him in accordance with the jury's verdict. This appeal followed.

## DISCUSSION

### I. Evidentiary Sufficiency

In his first issue, Lewis contends that the evidence was insufficient to prove that he used or exhibited a deadly weapon during the assault. Specifically, he argues that a reasonable juror could not have inferred that the metal bar was used in the assault and that, alternatively, "the metal bar was not capable of causing serious bodily injury in the manner that it was used."

When reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). In making this determination, we "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann*, 602 S.W.3d at 577. The factfinder "is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id.* The factfinder "can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and is "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record

6

supports conflicting inferences, we presume that the" factfinder "resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

We must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must also bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). "The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) (quoting *Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015)). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Kiffe*, 361 S.W.3d at 107 (quoting *Jackson*, 443 U.S. at 320). We "cannot act as a thirteenth juror" and make our own assessment of the evidence; rather, our "role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018).

Because Lewis's issue is limited to the deadly-weapon element, we will confine our analysis accordingly. His two arguments parallel the "two-step process" that we use when determining whether an object has been shown to be a deadly weapon. *See Flores v. State*, 620 S.W.3d 154, 158 (Tex. Crim. App. 2021); *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim.

7

App. 2000).  We first ask, "Could the object be a deadly weapon under the facts of the case?"  *See Glover v. State*, 710 S.W.3d 816, 820 (Tex. Crim. App. 2025), *cert. denied,* No. 25-6972 (U.S. May 4, 2026); *Flores*, 620 S.W.3d at 158.  If we answer that question affirmatively, we must then ascertain whether the object was used or exhibited during the offense.  *Glover*, 710 S.W.3d at 822; *Flores*, 620 S.W.3d at 158.

### A.      Could the Metal Bar Be a Deadly Weapon Under the Facts of the Case?

A deadly weapon includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."  Tex. Penal Code § 1.07(a)(17)(B).  "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  *Id.* § 1.07(a)(46).

To determine whether a weapon is deadly in its manner of use or intended use, we consider (1) "words and other threatening actions by the defendant, including the defendant's proximity to the victim"; (2) "the weapon's ability to inflict serious bodily injury or death, including the size, shape, and sharpness of the weapon"; and (3) "the manner in which the defendant used the weapon."  *Johnson v. State*, 509 S.W.3d 320, 323 (Tex. Crim. App. 2017) (internal citations omitted).  Although "[n]o one factor is determinative, and each case must be examined on its own facts," *Adame v. State*, 69 S.W.3d 581, 584 (Tex. Crim. App. 2002); *see Johnson*, 509 S.W.3d at 323 ("These, however, are just factors used to guide a court's sufficiency analysis; they are not inexorable commands."), the Court of Criminal Appeals has emphasized the third factor, declaring that "generally speaking, the nature of the object itself does not limit whether that object may be a deadly weapon; rather, it is only the 'manner of [the defendant's] use or

8

intended use' that provides any meaningful limitation to the broad statutory definition," *Flores*, 620 S.W.3d at 158–59 (quoting Tex. Penal Code § 1.07(a)(17)(B)) (brackets in original); *see id.* at 159 ("[C]ritical to a proper deadly-weapon analysis are the facts of the case showing the defendant's particular manner of use or intended use of the object—his reason for having the object with him."). In addition to the three *Johnson* factors, we may also consider the "presence and severity of wounds," which, however, "are not a prerequisite to a finding of deadliness." *Hammons v. State*, 856 S.W.2d 797, 800–01 (Tex. App.—Fort Worth 1993, pet. ref'd) (citing *Denham v. State*, 574 S.W.2d 129, 130 (Tex. Crim. App. 1978)).

To establish deadliness, the State is not required to present expert testimony, *id.* at 801 (citing *Denham*, 574 S.W.2d at 131), or to show "that the object actually cause[d] death or serious bodily injury," *Johnston v. State*, 115 S.W.3d 761, 764 (Tex. App.—Austin 2003), *aff'd*, 145 S.W.3d 215 (Tex. Crim. App. 2004). However, the object must have "more than a hypothetical capability of causing death or serious bodily injury." *Id.*

Regarding the first element, although there was no evidence of explicit verbal or physical threats toward Ramirez, the jury could have reasonably inferred from the small size of the room and the length of the bar that Lewis and Ramirez were in close proximity. *See Johnson*, 509 S.W.3d at 323.

The second *Johnson* factor likewise supports the metal bar's deadliness. Sauceda, the shelter employee who found the bar, testified that it was around a foot long, was made of metal, and was part of the bed frame. Officer Powell similarly described the object as "a metal rod of some kind" and a "long thin rectangular rod." The bar was admitted into evidence, and the jury was able to see it during the trial. *See Robertson v. State*, 163 S.W.3d 730, 734 (Tex. Crim. App. 2005) (noting that admission of object allows jurors to observe its characteristics); *Wilson v. State*,

9

391 S.W.3d 131, 137 (Tex. App.—Texarkana 2012, no pet.) (stressing that admitted sledgehammer was "not something that was abstract in the eyes of the jury; it was present in the courtroom for the jury to view and evaluate as to whether it could be classified as a deadly weapon"). Photographs of the bar showed that it had thin metal tabs branching perpendicularly from its body next to small indentations:



The jury was free to use its common sense in evaluating whether a footlong rectangular metal bar with a thin, irregular edge and rigid protuberances could cause death or seriously bodily injury. *See Eustis*, 191 S.W.3d at 884.

Evidence of the third factor and of Ramirez's injuries also supports the jury's finding. Ramirez told medical personnel that he had been struck in the head several times with an object by his roommate, and Officer Kory testified that bloodstains in the room suggested that Ramirez might have been lying on his bed for at least part of the assault. Sauceda testified that the metal bar had previously been straight, and a reasonable juror could have inferred from his testimony that Lewis hit Ramirez with enough force to bend the bar. There was "[b]lood everywhere," and Ramirez was "covered in blood." He had a large gash on his forehead, a cut on the back of his head, a "large lump on the left side of his head," and lacerations on his forearm and leg. He was able to go downstairs only with the assistance of first responders. Swearengin, the firefighter-paramedic, described the gash and lump as "significant" and explained that he was

concerned about what could be going on underneath the visible injuries; he had trouble seeing the cut on the back of Ramirez's head because "there was so much blood." Swearengin was concerned enough that he took Ramirez—who began exhibiting memory issues—to a trauma hospital. *See English v. State*, 171 S.W.3d 625, 628 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (blow from baseball bat causing pain, large gash requiring seven stitches, scar, bruising, swelling, and concussion caused serious bodily injury); *Powell v. State*, 939 S.W.2d 713, 718 (Tex. App.—El Paso 1997, no pet.) (concussion causing memory loss determined to be serious bodily injury).

In making its deadly-weapon determination, the jury was entitled to infer from Ramirez's injuries alone that Lewis used a deadly weapon. *See Tucker v. State*, 274 S.W.3d 688, 691–92 (Tex. Crim. App. 2008) ("Even without expert testimony or a description of the weapon, the injuries suffered by the victim can by themselves be a sufficient basis for inferring that a deadly weapon was used."). However, despite the scale of Ramirez's injuries, the State was not required to prove that Lewis actually caused serious bodily injury; rather, the State had to establish "only that 'the manner' in which [the metal bar] was either used or intended to be used was '*capable*' of causing death or serious bodily injury." *See Moore v. State*, 520 S.W.3d 906, 908 (Tex. Crim. App. 2017).

On this record and from our analysis of the *Johnson* factors, we conclude that a reasonable juror could have found beyond a reasonable doubt that the metal bar was a deadly weapon. *Cf. In re K.B.*, 143 S.W.3d 194, 200 (Tex. App.—Waco 2004, no pet.) (determining that evidence was legally insufficient for rational juror to find beyond reasonable doubt that metal pipe was deadly weapon because there was no evidence of proximity between victim and pipe, of pipe's size and shape, of manner in which defendant used pipe, or of any injuries to victim caused by pipe).

11

**B.      Did Lewis Use or Exhibit the Metal Bar During the Assault?**

As noted above, Ramirez—who according to Officer Kory's testimony and the location of the bloodstains might have been lying in bed during part of the assault—told Swearengin that he had been hit in the head with a blunt object.  Hospital records indicated that Ramirez was "assaulted with an unknown object by his roommate," Lewis, and that after getting into an argument with Lewis, Ramirez "was hit in the head several times with [an] unknown object[]."  Next to Ramirez's bed, Sauceda found the metal bar, which he noticed "had hair and blood on it."  Both Officers Cruz and Kory conceded that they did not search the room thoroughly, and Officer Kory testified that he did not look among Ramirez's clothing or underneath the beds.

Sauceda at first testified that he knew with "a hundred percent certainty" that he had discovered the metal bar the day after the assault and that he turned it over to Officer Powell the following day.  Although he later guessed that it might have been longer before Officer Powell retrieved the bar, Sauceda testified that no one resided in the room between the assault and the bar's discovery and that neither Lewis nor Ramirez returned to the room during that period.  And Sauceda ultimately testified that police retrieved the bar "the same or the next day."  Swearengin testified that the laceration on Ramirez's forehead did not have jagged edges and was consistent with having been caused by a "sort of straight-edge type of object" and that people with head injuries do not always know their cause; he further testified that there was no evidence that Ramirez's injuries were caused by a rubber object, as stated by Ramirez.  The jury was entitled to resolve the inconsistencies in Sauceda's testimony in favor of its verdict, and we may not second-guess its decision to do so.  *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018).

12

Viewing the entirety of the evidence in the light most favorable to the jury's verdict and recognizing that circumstantial evidence is as probative as direct evidence, we conclude that a reasonable juror could have found beyond a reasonable doubt that Lewis used the metal bar to assault Ramirez. *See Kiffe*, 361 S.W.3d at 108. To the extent that Lewis challenges the adequacy of the investigation in this case, an appellate court's role in conducting a sufficiency review is not to consider what additional evidence might have been gathered through a more thorough investigation but to consider the evidence that was presented at trial and decide whether that evidence was sufficient to support the conviction, *see Murray v. State*, 457 S.W.3d 446, 449 (Tex. Crim. App. 2015) (explaining that appellate courts should not focus on evidence that was "missing" compared to evidence in other cases and instead should determine whether evidence that was admitted would allow any rational fact finder to convict), and the jury may use "common sense, common knowledge, personal experience, and observations from life when drawing inferences," *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). Ramirez was struck on the head with an object in a small room. Creekbaum responded while the fight was still occurring, from which the jury could have inferred that Lewis had little opportunity to dispose of the weapon. The day after the assault, Sauceda found a footlong piece of the metal bedframe with an edge that matched Ramirez's wounds and on which he observed hair and blood. The metal bar appeared to have been bent in the middle and was next to Ramirez's bed, which was heavily stained with blood, suggesting the assault may have occurred at least in part in that location.

Although Lewis in his brief suggests other items in the room that could have caused Ramirez's injuries and emphasizes evidence that the State did not present, we consider only "the combined and cumulative force of *all admitted evidence*," and the State is not required to "negate every other reasonable hypothesis raised by the evidence." *Ramsey v. State*, 473 S.W.3d 805,

13

808 & n.3 (Tex. Crim. App. 2015) (emphasis added); *see Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018) ("Focusing on other reasonable explanations for evidence improperly applies the abrogated reasonable-alternative-hypothesis construct."). Moreover, Lewis's arguments regarding potential custody issues with the metal bar go only to its weight, *LopezGamez v. State*, 622 S.W.3d 445, 458 (Tex. App.—Fort Worth 2020, pet. ref'd), and we presume that the jury resolved all such issues in favor of its verdict, *see Merritt*, 368 S.W.3d at 525–26.

And while Swearengin testified that the desk edge was more likely to have caused Ramirez's injuries than a blunt rubber object, he stressed on re-direct that he had been asked to compare only those two objects. A reasonable juror could have concluded from the nature and locations of Ramirez's injuries—including lacerations on the front and back of his head, his leg, and his forearm—that it was more likely that he had been struck with the metal bar than that he had repeatedly contacted the desk edge, which had only a small amount of blood on it, with various parts of his body and with enough force to cause apparent straight-edged lacerations. Such a conclusion is supported by Ramirez's statements that Lewis struck him with an object. A reasonable juror could have inferred from the desk's apparent size and weight, as depicted in photographs of Room 204, that Lewis would have been unable to wield it to strike Ramirez.

Having determined that a rational jury could have answered both inquiries in the "two-step process" affirmatively and found beyond a reasonable doubt that Lewis used a deadly weapon to assault Ramirez, we overrule Lewis's first issue. *See Glover*, 710 S.W.3d at 822; *Flores*, 620 S.W.3d at 158; *McCain*, 22 S.W.3d at 503.

14

## II.     Louisiana Conviction

We first note that Lewis's second issue is in fact three issues argued in the alternative, each challenging the use for enhancement purposes of his Louisiana conviction for introducing contraband into a penal institution.  Specifically, he argues that (1) the trial court erred by instructing the jury that his conviction should be treated as a felony conviction pursuant to subsection 12.41(1) of the Texas Penal Code, (2) section 12.41 is unconstitutional as applied to him, and (3) the evidence was insufficient to prove his conviction beyond a reasonable doubt.  *See* Tex. Penal Code § 12.41.  We consider each issue in turn.

### A.     Jury-Charge Error

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case."  Tex. Code Crim. Proc. art. 36.14.  The jury charge should tell the jury what law applies and how it applies to the case.  *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007).  The trial court's duty to instruct the jury on the "law applicable to the case" exists even when defense counsel fails to object to inclusions or exclusions in the charge.  *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) (citing *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011)).  The trial court is "ultimately responsible for the accuracy of the jury charge and accompanying instructions."  *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018) (quoting *Delgado*, 235 S.W.3d at 249).

We review alleged jury-charge error in two steps:  first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal.  *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)).  When, as here, the defendant objects

during the proceedings below, we must determine whether the record establishes that the error caused him "some harm." *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

Lewis contends that "[t]he trial court erred in instructing the jury on the range of punishment" because the first enhancement paragraph alleged "an out-of-state conviction that is not a felony." The punishment-phase jury charge instructed the jury that each of the indictment's two enhancement paragraphs alleged that Lewis had been finally convicted of a felony offense in Louisiana. The charge further instructed jurors that "[t]o determine the correct range of punishment in the instant case, you must first determine whether or not [Lewis] has been previously convicted as alleged in each of the enhancement paragraphs of the indictment." If jurors found the allegations in both enhancement paragraphs to be true, they were to assess Lewis's punishment at confinement for life or for "any term of not more than ninety-nine (99) years or life or less than twenty-five (25) years." However, if they found only one of the allegations to be true, his period of confinement was required to be "not more than ninety-nine (99) years or life or less than five (5) years."

"An out-of-state prior final felony conviction can be used to enhance a sentence imposed in Texas." *Ex parte Pue*, 552 S.W.3d 226, 231 (Tex. Crim. App. 2018). The Legislature enacted section 12.41 of the Penal Code "to deal specifically with the classification for enhancement purposes of convictions obtained outside the Penal Code." *Ex parte Blume*, 618 S.W.2d 373, 376 (Tex. Crim. App. 1981). Subsection 12.41(1) provides that a non-Penal Code conviction, such as an out-of-state conviction, is classified as a third-degree felony if imprisonment in a penitentiary is "affixed to the offense as a possible punishment." Tex. Penal Code § 12.41; *see Robles v. State*, 141 S.W.3d 250, 252 (Tex. App.—Austin 2004, pet. ref'd) (observing that section 12.41 "has been held to apply to prior convictions obtained under Texas

16

statutes other than the current penal code, as well as to previous convictions obtained outside of Texas under the laws of other states and the federal government"). Such a conviction "may be used for enhancement of punishment pursuant to [section] 12.42," *Trotti v. State*, 698 S.W.2d 245, 246 (Tex. App.—Austin 1985, pet. ref'd), which provides in relevant part:

> [I]f it is shown on the trial of a felony offense other than a state jail felony punishable under Section 12.35(a) that the defendant has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having become final, on conviction the defendant shall be punished by imprisonment in the Texas Department of Criminal Justice for life, or for any term of not more than 99 years or less than 25 years. A previous conviction for a state jail felony punishable under Section 12.35(a) may not be used for enhancement purposes under this subsection.

Tex. Penal Code § 12.42(d)

In determining the classification of a prior conviction under section 12.41, an appellate court may take judicial notice of the laws of another state, even when the text of those laws does not appear in the trial record. *See* Tex. R. Evid. 202 (allowing court, "at any stage of the proceeding," to "take judicial notice on its own" of another state's public statutes); *Tate v. State*, 120 S.W.3d 886, 889 (Tex. App.—Fort Worth 2003, no pet.) ("We may take judicial notice of another state's law for the first time on appeal."); *see also Ex parte Mason*, 656 S.W.2d 470, 471 (Tex. Crim. App. 1983) ("[W]e reject the notion that an appellate court must look solely to the record made in the trial court for 'evidence' of statutory provisions in the law of a sister state.").

Before addressing the merits of Lewis's issue, we first recognize that Texas and Louisiana distinguish felonies from misdemeanors using different language. As reflected in subsection 12.41(1), Texas principally defines a felony by the location of the offender's confinement. *See* Tex. Penal Code § 1.07(23) ("'Felony' means an offense so designated by law

17

or punishable by death or confinement in a penitentiary.").  Penitentiary "is largely a term of art in Texas" but "still denotes a place of confinement for felons." *Prado v. State*, No. 11-99-00053-CR, 2000 WL 34234883, at *4 (Tex. App.—Eastland Jan. 13, 2000, pet. ref'd) (not designated for publication), *overruled on other grounds by Brooks v. State*, 323 S.W.3d 893, 894 (Tex. Crim. App. 2010); *see Penitentiary*, Black's Law Dictionary (12th ed. 2024) ("A correctional facility or other place of long-term confinement for convicted criminals; PRISON.").

Louisiana's classification structure distinguishes between felonies and misdemeanors based on whether an offense is subject to imprisonment "at hard labor." *See* La. Stat. §§ 14:2(A)(4) (2018)[1] (defining "felony" as "any crime for which an offender may be sentenced to death or imprisonment at hard labor"), (6) (defining "misdemeanor" as "any crime other than a felony").  Felonies are in turn divided into "absolute" felonies, which "are those where a conviction would necessarily mean confinement at hard labor," and "relative" felonies, "in which a conviction would not necessarily mean confinement at hard labor." *State v. Breaux*, 2024-00737 (La. 5/9/25), 408 So. 3d 899, 903–04.  Confusion over Louisiana's scheme has led our sister courts to conclude that Louisiana "does not distinguish felonies from misdemeanors based upon the institution where confinement is ordered," *Cain v. State*, 721 S.W.2d 493, 494 (Tex. App.—Houston [1st Dist.] 1986, no pet.), and that Louisiana's definition of felony makes "the

---

[1] The conviction that Lewis challenges was for an offense committed on October 5, 2018. Under Louisiana law, the applicable statutes are those that were in effect at the time of the offense's commission. *See State v. Sugasti*, 2001-3407 (La. 6/21/02), 820 So. 2d 518, 520 (stating that "the law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer" and that "[a] defendant must be sentenced according to sentencing provisions in effect at the time of the commission of the offense").  Accordingly, unless otherwise noted, all citations to Louisiana statutes are to those in effect on October 5, 2018.

identification of enhancement-eligible convictions difficult," *Thomas v. State*, 482 S.W.3d 235, 245–46 (Tex. App.—Eastland 2015, no pet.); *see Cain*, 721 S.W.2d at 494.

However, despite the different wording of Texas's and Louisiana's statutes, we conclude that there is no substantive difference in how they define felony offenses. That is because in Louisiana "[a] sentence of imprisonment in the state penitentiary *is* an imprisonment at hard labor." *State v. Gardner*, 351 So. 2d 105, 107 n.2 (La. 1977) (emphasis added); *see also State v. Morgan*, 116 So. 2d 682, 688 (La. 1959) ("[T]he term 'felony' denotes or means a crime for which the punishment may be . . . imprisonment at hard labor in the State Penitentiary . . . . A sentence to imprisonment in the penitentiary is, in fact, though not in precise words, 'an imprisonment at hard labor.'"); *State v. Rigmaiden*, 65 So. 229, 229 (La. 1914) ("The term, 'imprisonment at hard labor,' used in the Constitution and statutes of this state, means imprisonment at hard labor in the state penitentiary.").

In arguing that the Louisiana conviction alleged in the first enhancement paragraph was not a felony, Lewis asserts that instead of using the definition of "felony" in subsection 14:2(A)(4) of Louisiana's Criminal Code, we should instead use the definition "under the Louisiana Administrative Code title 22, Pt IX, § 205, titled Criminal History Index Classification System," in which "felony" is defined as "a conviction for an offense punishable by a sentence of death or imprisonment, with or without hard labor, in excess of one year at the time of conviction, under the laws of this state, any other state, the United States, or any foreign government or country." 22 La. Admin. Code Pt IX, § 205(B). Under the latter definition, Lewis urges, his conviction would have been for a misdemeanor offense because "'the offense is not a felony' as defined by Louisiana law," and he was "therefore presumably sentenced to a parish jail (without hard labor)."

We reject Lewis's argument because he incorrectly focuses on his own sentence and not, as required by an analysis under section 12.41, the full range of available punishments for the statutory offense for which he was convicted. *See* Tex. Penal Code § 12.41(1) (considering whether imprisonment in penitentiary is "a possible punishment").

Lewis was convicted of introducing contraband into the grounds of a penal institution, an offense under subsection 402(E) of the Louisiana Criminal Code, which criminalized the introduction of various listed items—including "any instrumentality customarily used as a dangerous weapon"—"into or upon the premises of any municipal or parish prison or jail." *See* La. Stat. § 14:402(E)(6) (2018). The bill of information against him, which indicated the conviction was for a felony offense, alleged that on or about October 5, 2018, he "introduced contraband, to-wit: a blade into the West Feliciana Parish Jail." At the time of Lewis's offense, the punishment for a violation of any provision of section 402 included a fine of between $500 and $10,000 and "imprison[ment] with or without hard labor for not more than ten years." *Id.* § 14:402(G)(1) (2018).[2]

Accordingly, because the offense for which Lewis was convicted was a relative felony punishable by imprisonment with hard labor (i.e., in a penitentiary) for up to ten years, it is classified as a third-degree felony under subsection 12.41(1). *See id.*; Tex. Penal Code § 12.41(1); *Gardner*, 351 So. 2d at 107 n.2; *see also State v. Miller*, 2003-0206 (La. 10/21/03), 857 So. 2d 423, 431 (stating that prior version of section 14:402, which was punishable in part by "imprison[ment]

---

[2] Both the State and Lewis cite to an earlier version of the statute in which imprisonment was capped at five years. *See* La. Stat. § 14:402(G) (2017). That version, however, was only effective until July 31, 2018, and was replaced by the version quoted above. *See* 2018 La. Acts 464, § 1 (effective August 1, 2018). Because Lewis committed the offense on October 5, 2018, he was subject to imprisonment for up to ten years.

with or without hard labor for not more than five years," "would constitute a felony under this state's substantive criminal law"). Whether Lewis was sentenced to imprisonment with or without hard labor is as irrelevant a matter as the length of his specific sentence; our sole concern is whether imprisonment in a penitentiary was affixed to section 14:402 "as a possible punishment." *See* Tex. Penal Code § 12.41(1). Because it was, we conclude that the trial court did not commit charge error in this case.

## B.    As-Applied Constitutional Challenge

Lewis next contends that "§ 12.41 of the Texas Penal Code is unconstitutional as applied to him." The State responds that this issue was not preserved.

Preservation of error is a systemic requirement on appeal. *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) (citing *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005)). If an issue has not been preserved for appeal, we should not address the merits of that issue. *Id.* To preserve a complaint for appellate review, there must ordinarily be a timely, specific objection and a ruling by the trial court. Tex. R. App. P. 33.1(a). "To be timely, a complaint must be made as soon as the grounds for complaint [are] apparent or should be apparent." *Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999). To be sufficiently specific, an objection need not employ "hypertechnical or formalistic . . . words or phrases," *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018); "magic words," *Ford*, 305 S.W.3d at 533; or a citation to a particular statute, *Laws v. State*, 640 S.W.3d 227, 229 (Tex. Crim. App. 2022) (quoting *Ford*, 305 S.W.3d at 533). Rather, the objecting party must "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it." *Pena v. State*,

285 S.W.3d 459, 464 (Tex. Crim. App. 2009); *see Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). "This gives the trial judge and the opposing party an opportunity to correct the error." *Pena*, 285 S.W.3d at 464 (citing *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005)).

The Court of Criminal Appeals has held that an as-applied constitutional challenge must be raised before the trial court, or it is waived.[3] *See Reynolds v. State*, 423 S.W.3d 377, 383 (Tex. Crim. App. 2014) (stating that "'[a]s applied' constitutional claims are subject to the preservation requirement and therefore must be objected to at the trial court in order to preserve error"); *Flores v. State*, 245 S.W.3d 432, 437 n.14 (Tex. Crim. App. 2008) (recognizing "the well-established requirement that appellant must preserve an 'as applied' constitutional challenge by raising it at trial").

As the State correctly observes, Lewis did not raise any challenge to the constitutionality of section 12.41 in the trial court; thus, he has failed to preserve this issue for our review. *See* Tex. R. App. P. 33.1(a); *Reynolds*, 423 S.W.3d at 383; *Flores*, 245 S.W.3d at 437 n.14.

C.     **Sufficiency of Evidence of Enhancement Conviction**

Finally, Lewis contends that the evidence was insufficient to prove his Louisiana conviction for introducing contraband into the grounds of a penal institution. He argues that there

---

[3]     An exception exists where the challenged statute has previously been held unconstitutional; in such cases, it is "void ab initio," and there is no valid law upon which to base the conviction. *See Ex parte Beck*, 541 S.W.3d 846, 856 (Tex. Crim. App. 2017); *Smith v. State*, 463 S.W.3d 890, 896–97 (Tex. Crim. App. 2015). Because section 12.41 has not been held unconstitutional, the exception is inapplicable in the present case. *See Ex parte Moy*, 523 S.W.3d 830, 834 n.4 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

is no judgment for the conviction in the record, that the State's fingerprint expert falsely testified that Lewis's fingerprints were contained in the Louisiana criminal records admitted at trial, that the cause number on the bill of indictment differed from the cause number recited in the indictment and punishment charge, and that the sentencing date for the conviction—as given at one location in the records—did not match the date recited in the indictment.

To establish that a defendant has been convicted of a prior offense, "the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction." *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). "No specific document or mode of proof is required to prove these two elements," and Texas lacks a "best evidence" rule requiring that "the fact of a prior conviction be proven with any document, much less any specific document." *Id.* "While evidence of a certified copy of a final judgment and sentence may be a preferred and convenient means, the State may prove both of these elements in a number of different ways." *Id.* What is more, evidence linking a defendant to a prior conviction may be circumstantial. *Ex parte Rodgers*, 598 S.W.3d 262, 269 (Tex. Crim. App. 2020).

Whatever the "evidentiary puzzle pieces the State offers to establish the existence of a prior conviction and its link to a specific defendant," it is the jury's job to determine if the pieces "fit together sufficiently to complete the puzzle." *Flowers*, 220 S.W.3d at 923. In doing so, jurors must weigh the credibility of each piece of evidence; look at the totality of the evidence adduced; and consider the evidence as a whole, as each piece of evidence may provide little meaning if considered in isolation. *Henry v. State*, 509 S.W.3d 915, 919 (Tex. Crim. App. 2016); *Wood v. State*, 486 S.W.3d 583, 589 (Tex. Crim. App. 2016). We in turn must consider all the evidence in the light most favorable to the trial court's finding and determine whether a rational

23

trier of fact could have found both essential elements beyond a reasonable doubt. *Wood*, 486 S.W.3d at 589.

The indictment's first enhancement paragraph alleged that

on or about the 15th day of February, 2019, in 18-WFL-775 in the 20th Judicial District Court for the Parish of East and West Feliciana, State of Louisiana, styled State of Louisiana vs. JAIRICK LEWIS, **JAIRICK PADARIUS LEWIS,** defendant herein, was finally convicted of the felony offense of INTRODUCING CONTRABAND INTO OR UPON THE GROUNDS OF ANY PENAL INSTITUTION, alleged to have been committed on or about the 5th day of October, 2018, upon an information then pending in said Court.

To prove the existence of Lewis's conviction in cause number 18-WFL-775, the State presented testimony from Womack, its fingerprint expert, and introduced into evidence certified records from the Louisiana DOC (exhibit P1), certified copies of bills of information from and minutes taken in two additional Louisiana cases brought against Lewis (exhibit P2), and a ten-print card of Lewis's fingerprints taken with the agreement of both parties before the punishment hearing (exhibit P3).

Womack testified that it was impossible for two people to have the same fingerprints and that Lewis's fingerprints (as recorded in the ten-print card) matched a set of fingerprints on the "second to last page" of P1:

Q. Do you recognize what's on the second last page of P1?

A. Yes, ma'am.

Q. What do you recognize on that page?

A. I recognize the known that I compared to my ten-print that I took to these prints, and I conducted comparison of all ten digits and it is in my opinion a match to Jairick Lewis.

Q. Let's just take a step back for a moment. On that second to last page there's a set of fingerprints, correct?

A. Yes, ma'am.

Q. Do you see a name associated with those fingerprints?

A. Yes, ma'am.

Q. What is the name associated with those prints?

A. It shows to be the name of Jairick Lewis.

Q. And prior to testifying today, you had an opportunity to review those fingerprints and compare them to the prints that you took of the defendant today in P3?

A. That's correct.

. . . .

Q. Mr. Womack, now that [P1 is] in evidence, you mentioned it briefly earlier, but in reviewing these two sets of fingerprints, the prior fingerprints that are from P1 and the fingerprints that you took in State's Exhibit P3, what findings did you make?

A. It is my opinion that in fact they are a match, one to another.

In his brief, Lewis correctly notes that no fingerprints are visible in the copy of P1 in the record, which is of poor quality. The State responds that the scanner used to digitize the exhibit likely did not "pick up" Lewis's prints and that it is telling that defense counsel did not object to Womack's testimony. Rather than infer that Womack gave false testimony, as argued by Lewis, we conclude that the existence of any fingerprints in the DOC records went to their weight and to Womack's credibility, which were matters for the jury to decide. *See Henry*, 509 S.W.3d at 919. The records were admitted into evidence, and the jury was able to judge for itself whether they included fingerprints. *See Wood*, 486 S.W.3d at 589. We presume that they found Womack's testimony credible. *See id.*

25

But Lewis's fingerprints were far from the only evidence connecting him to the conviction in cause number 18-WFL-775. The certified DOC records included several documents pertaining to the cause number and containing Lewis's personal and biometric information as well as his photograph. Among the records were (1) a "court docket record summary screen" with Lewis's race, sex, and SID [State Identification] and DOC numbers, which recited a "sentence date" of February 7, 2019, in cause number "18WFL775"; (2) a "court offense record summary screen" that contained the same identifying information and noted that the offense statute for cause number 18WFL775 was "14:402" (as seen above, the introducing-contraband statute), that the offense date was October 5, 2018, and that Lewis was sentenced to one year of confinement; (3) a "release date computation information" listing much of the same information as the previous records and giving the parish for cause number 18WFL775 as "WFL," which a rational juror could have inferred stood for West Feliciana; (4) a "master record," which in addition to the aforementioned identifying information recited Lewis's date of birth, driver's license number, height and weight, hair and eye color, FBI and Social Security numbers, "complexion," and shoe size; and (5) a "suspect rap sheet" including similar identifiers and a photograph of "Jairick Lewis." The records also included a "diminution of sentence," which stated that Lewis was to be released "in the same manner as if on parole" on September 23, 2019, in cause number 18WFL775. And lastly, the records included a bill of information for cause number "18-WFLN-775," styled *State of Louisiana v. Jairick Lewis*, in the Twentieth Judicial District Court for the Parish of East and West Feliciana. The bill of information contained Lewis's date of birth, sex, and race; noted that the case was a felony; and alleged that in October 2018 Lewis "committed the offense of Introducing Contraband Into Or Upon The Grounds Of A Penal Institution in that he introduced contraband, to-wit: a blade into the West Feliciana Parish Jail."

26

The Court of Criminal Appeals has found authenticated criminal records that contained a defendant's personal identifying information to be sufficient evidence of a prior conviction. *See, e.g.*, *Ex Parte Warren*, 353 S.W.3d 490, 494–95 (Tex. Crim. App. 2011) (determining that defendant's [computerized criminal history] record was sufficiently corroborated—in part because dates of arrest, charge, and conviction matched dates in defendant's original indictment and judgment—and declaring that "[m]ost importantly, both documents contain the same FBI number"); *Flowers*, 220 S.W.3d at 924–25 (concluding that certified computer printouts of defendant's conviction record and driver's license record were sufficient to substitute for judgment and to link defendant to offense and emphasizing that driver's license record had defendant's photograph, "which the trial judge could use to compare to the person standing before him"); *Johnson v. State*, 410 S.W.2d 785, 787 (Tex. Crim. App. 1967) (finding that authenticated records from California, which contained defendant's picture and physical description and recited his burglary conviction, were sufficient "to enable the [trial c]ourt to look at the appellant before him and conclude that he was the same person who had been convicted in California").

To paraphrase the court, although it is conceivable that there are two men named Jairick Lewis with the same date of birth, personal descriptors, and appearance, it is unlikely. *See Flowers*, 220 S.W.3d at 925; *see also Warren*, 353 S.W.3d at 495 (describing it as "not likely" that someone other than defendant was "convicted of Injury to a Child in Texas in 1987 [and] was also convicted of four counts of Contributing to the Sexual Delinquency of a Child in Illinois in 1972"). We conclude that the evidence detailed above was sufficient for a rational juror to find that the allegation in the first enhancement paragraph was true.

Having rejected Lewis's jury charge, constitutional, and evidentiary sufficiency challenges, we overrule his second issue.

## CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Crump and Ellis

Affirmed

Filed:   June 5, 2026

Publish